UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JODIE ROUSTIO, for J.R.,           )
                                    )
          Plaintiff,                )
                                    )
     vs.                            )          Case No. 4:06CV00573AGF
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
          Defendant.                )


## MEMORANDUM AND ORDER

This action is before the Court[1] for judicial review of the final decision of the

Commissioner of Social Security, denying the application for supplemental security

income ("SSI") filed by Jodie Roustio on behalf of her minor son, J. R. (hereinafter

"Plaintiff"), under Title XVI of the Social Security Act, 42 U.S.C. § 1382c.  For the

reasons set forth below, the decision of the Commissioner shall be reversed and the case

remanded for further consideration.

Plaintiff was born on September 8, 1998.  On March 31, 2004, Ms. Roustio

protectively filed an application for SSI benefits for J.R., who was then five years old,

claiming a disability onset day of July 1, 2003, due to behavioral disorders.  The

application was denied at the initial administrative level, and Plaintiff requested a hearing

before an administrative law judge ("ALJ").  A hearing was held on August 16, 2005, at

---

[1]      The parties have consented to the exercise of authority by the undersigned United
States Magistrate Judge under 28 U.S.C. § 636(c).

which Plaintiff was present, but only Ms. Roustio testified.  On September 21, 2005, the

ALJ issued a decision that Plaintiff was not disabled as defined by the Social Security

Act.  Plaintiff appealed to the Appeals Council of the Social Security Administration,

which denied his request for review.  Plaintiff has thus exhausted all administrative

remedies and the ALJ's decision stands as the final agency action.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in

the record.  Specifically, Plaintiff argues that the ALJ erred in finding that Plaintiff had

less than a marked limitation in acquiring and using information, attending to and

completing tasks, and interacting and relating to others; and in finding that Plaintiff thus

did not meet the criteria of a presumed-disabling impairment listed in the Commissioner's

regulations.[2]

## BACKGROUND

### School and Medical Records

Plaintiff was admitted to a hospital on June 30, 2003, at the age of four, for

behavior problems.  He was assessed with a GAF of 10[3] on admission.  The admitting

---

[2]   Under these regulations, a child is presumed to be disabled if he has a marked
limitation in two, or a serious limitation in one, of the following six functional domains:
(1) acquiring and using information, (2) attending to and completing tasks, (3) interacting
and relating with others, (4) moving about and manipulating objects, (5) caring for
oneself, and (6) health and physical well-being.  42 C.F.R. § 416.926a(b)(1).

[3]   A GAF score represents a clinician's judgment of an individual's overall ability to
function in social, school, or occupational settings, not including impairments due to
physical or environmental limitations.  Diagnostic & Statistical Manual of Mental
Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "major" impairment

physician noted that Plaintiff was extremely restless, fidgety, and easily distracted, and had minimal verbalization. Plaintiff did not exhibit self-injurious behavior and had no overt psychotic symptoms. His insight was appropriate for his age, and his judgment was poor by history. The doctor noted that Plaintiff was taking Singulair (used to treat asthma). Plaintiff participated in group and individual therapy, and showed improvement. He was discharged on July 1, 2003, with a diagnosis of oppositional defiant disorder ("ODD") and the possibility of attention deficit with hyperactivity disorder ("ADHD"). His GAF at discharge was 35, which was also noted as his highest GAF for the prior year. Tr. at 102-103, 118-20.

On the date of discharge, Laura Miller, M.A., a therapist with the hospital, filled out a Biopsychosocial Assessment of Plaintiff, noting Plaintiff's mother as her informant. The assessment noted that Plaintiff had become out of control and physically aggressive with his peers, grandmother, mother, "or anyone." Plaintiff would "head bang," throw himself on the floor, hit himself with his fists, and intrude on others' personal space. He was impulsive and was "extremely" hyperactive. It was further noted that Plaintiff had been diagnosed with ADHD in December 2002, but that Plaintiff's mother tried to deal with it without medication. Plaintiff's mother reported that Plaintiff had been kicked out of two day care centers, and that there was a family history of ADHD. Plaintiff's mother

_____

in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; and scores of 61-70 indicate "mild" impairment.

was at her "wits end," was afraid to lose another day care placement, and wanted medication for Plaintiff.  Tr. at 110-17.

Ms. Miller indicated, in checklist format, that Plaintiff had a depressed/irritable mood, had problems with concentration and indecision, was restless, had mood swings, thought faster than he could speak, had impulsive behavior and difficulty controlling his temper, had difficulty sustaining attention, did not seem to listen, did not follow through on instructions, and had "difficulty organizing."  He also often lost his temper, was argumentative, actively defied/refused to comply with requests or rules, fidgeted and was unable to remain seated, had difficulty engaging in leisure quietly, was always "on the go," talked excessively, blurted out answers, had difficulty awaiting turn, interrupted others, was aggressive toward others, destroyed property at times, and engaged in self-harming behavior.  Ms. Miller wrote on the form that Plaintiff was described as very physically and verbally abusive to everyone.  Tr. at 112-13.

Therapist Miller also indicated, on a Mental Status Checklist, that Plaintiff was inattentive, had scattered concentration, was very restless and loud, had a labile affect, and had poor and naive insight or judgment.  Ms. Miller noted that Plaintiff was extremely hyper and "all over the room," into everything, and had difficulty listening to and following directions.  She also noted that Plaintiff had an average intellect and normal memory ability.  Ms. Miller recommended that Plaintiff's coping skills needed to be increased, his hyperactive behaviors needed to be decreased, and he needed to be evaluated for medication.  Tr. at 110-17.

The record shows that Plaintiff was admitted to the inpatient unit at the hospital the next day, July 2, 2003, and was discharged on July 25, 2003, on Dexedrine (used to treat ADHD). Plaintiff's GAF upon discharge is illegible. Tr. at 101. As will be discussed later, the ALJ read this entry a "75," but the Court finds that the number is totally unclear, and could just as easily be read as 25.

On October 6, 2003, Plaintiff saw Dr. Paula Baker, M.D., for medication monitoring. At the time, Plaintiff was taking 5 mg of Dexadrine for his ADHD. Tr. at 132. This was changed to 2.5 mg of Adderall on February 6, 2004, at which time Dr. Baker noted that Plaintiff's mother was concerned that he was still being disruptive, and that his Dexadrine was "not lasting as long." Tr. at 129. Plaintiff did not show up to his appointment with Dr. Baker on March 5, 2004, but he did see her on March 10, 2004. Tr. at 128. At that time, Plaintiff's Adderall prescription was increased to 5 mg and Dr. Baker noted Plaintiff was impulsive, disruptive, had increased anger and acted out. Tr. at 127.

Ms. Roustio completed an extensive Function Report on April 19, 2004, in connection with the application for SSI benefits. She indicated, in checklist format, that Plaintiff, who was five-years old at the time, had problems talking clearly; he could be understood most of the time by people who know him, and some of the time by people who did not know him, and he did not pronounce words correctly. Ms. Roustio further indicated that Plaintiff asked a lot of questions, used complete sentences of more than four words most of the time, took part in conversations with other children, asked for

what he wanted, told about things and activities that happened in the past, could tell a made-up or familiar short story, and could answer questions about a short read-aloud children's story or TV story. Plaintiff could not deliver simple messages such as a telephone message, and did not pay attention to books. Ms. Roustio wrote that Plaintiff asked for something every time they went to the store, and that he could talk about movies he had seen and about his conversations and arguments. Tr. at 85-88.

Ms. Roustio also indicated on the April 19, 2004 Function Report that Plaintiff could recite numbers to three, count three objects, define common words, and identify most colors and shapes. He knew his age and asked what words meant "sometimes." Plaintiff did not know his birthday or telephone number, could not read capital letters, and could not understand jokes. Ms. Roustio indicated that Plaintiff could catch a large ball, ride a tricycle or bike with training wheels, wind up a toy, print at least some letters, copy his first name, and use scissors fairly well. He did show affection towards other children and his parents, played "pretend" with other children, preferred to play with older children, and played board games. Plaintiff did not enjoy being with other children the same age, sharing toys, taking turns, and playing games like tag and hide and seek. Tr. at 89-90.

Ms. Roustio noted that Plaintiff usually controlled his bowels and bladder during the day, ate using a fork and spoon by himself, dressed himself without help (except for tying his shoes), washed or bathed without help, and brushed his teeth without help. Plaintiff did not put his toys away. He could pay attention for more than 30 minutes to

6

"TV, music, reading aloud or games." She wrote that Plaintiff would watch TV all night long and play video games for hours, but would not sit still for a book. In the remarks section of the Function Report, Ms. Roustio wrote that when Plaintiff played with other children, it often ended in a fight because he did not play fair, and that Plaintiff was selfish and often got violent. Plaintiff would start yelling, grinding his teeth, and clenching his fists. Ms. Roustio further remarked that Plaintiff would try to hurt her if he got mad at her, and that she thought that Plaintiff thought that this was how to get his way. Tr. at 91-92.

According to a May 21, 2004 phone contact report prepared by the Social Security Administration, Ms. Roustio reported that Plaintiff was on 5 mg of Adderall, and that it worked "a lot better" than Dexadrine, which reportedly lasted six to seven hours, but was not "lasting as long," lasting only four to five hours. Plaintiff showed improvement in paying "a lot more" attention, sitting down and doing his ABCs, writing his name, and not getting frustrated. Plaintiff was more "acceptive" of other children, played less aggressively, shared more, and would not fight without first thinking about his actions. The report of contact noted that Ms. Roustio said that Plaintiff was "actually able to sit down and wants to learn more" and would watch and listen to his mother. Tr. at 81-83.

On May 25, 2004, Sandra Ervin, Plaintiff's pre-kindergarten teacher since March 12, 2004, completed an extensive Teacher Questionnaire, evaluating Plaintiff's performance in the six functional domains noted above: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others,

(4) moving about and manipulating objects, (5) caring for himself, and (6) medical conditions and medications/health and physical well-being.  Tr. at 73-80.

In the first domain, acquiring and using information, Ms. Ervin indicated that, on a daily basis, Plaintiff had a slight problem understanding school and content vocabulary and learning new material; an obvious problem comprehending oral instructions, reading, comprehending written material, comprehending and doing math problems, and expressing ideas in written form; a serious problem with understanding and participating in class discussions, providing organized oral explanations, and recalling and applying previously learned material; and a very serious problem with applying problem-solving skills in class discussions.  Ms. Ervin wrote that Plaintiff needed to be continually redirected, wanted all the attention if participating in a classroom discussion and that, if this did not happen, Plaintiff would hit himself in the head and refuse to participate. Plaintiff did not like to lose games, and had problems understanding any type of win/lose situation.  Tr. at 74.

In the domain of attending and completing tasks, Ms. Ervin indicated that, on a daily basis, Plaintiff experienced slight problems sustaining attention during play or sports activities, focusing on a given task when necessary, completing work accurately without careless mistakes, and working without distracting self or others; obvious problems focusing long enough to finish an assigned activity or task, carrying out single-step instructions, changing from one activity to another without being disruptive, organizing his own things or school materials, completing class/homework assignments,

and working at a reasonable pace/finishing on time; and serious problems paying attention when spoken to directly, carrying out multi-step instructions, and waiting to take turns. Ms. Ervin observed that Plaintiff needed structure, support, and extra assistance to complete his assignments. Tr. at 75.

Ms. Ervin also noted Plaintiff's daily problems interacting with and relating to others. These included slight problems respecting or obeying adults in authority and using language appropriate to the situation and listener; obvious problems playing cooperatively with other children, seeking attention appropriately, and interpreting meaning of facial expression, body language, hints, and sarcasm; serious problems making and keeping friends, asking permission appropriately, following rules, introducing and maintaining relevant and appropriate topics of conversation, and taking turns in a conversation; and very serious problems expressing anger appropriately, relating experiences and telling stories, and using adequate vocabulary and grammar to express thoughts or ideas in general, everyday conversation. Ms. Ervin further indicated that Plaintiff would benefit from behavior modification strategies, stating that "time out" was used on occasion, and that Plaintiff had to be constantly redirected. Ms. Ervin indicated she could understand "very little" of Plaintiff's speech on the first attempt, and could understand one-half to two-thirds of his speech after repetition and/or rephrasing. Ms. Ervin indicated that Plaintiff had no problems moving about and manipulating objects. Tr. at 76-77.

Ms. Ervin noted Plaintiff's daily problems caring for himself, including obvious

problems using good judgment regarding personal safety and dangerous circumstances, using appropriate coping skills to meet daily demands of school environment, and knowing when to ask for help. Ms. Ervin noted Plaintiff's serious problems being patient when necessary and identifying and appropriately asserting emotional needs. Plaintiff also had very serious problems handling frustration appropriately and responding appropriately to changes in his own mood. He had no problem taking care of his personal hygiene or caring for his physical needs, such as dressing and eating. Ms. Ervin wrote that Plaintiff could not handle his frustration appropriately and hit himself in the head, smacked himself in the face, or otherwise inappropriately handled his frustration. Tr. at 78.

Ms. Ervin noted that Plaintiff took Adderall on a regular basis and that his functioning changed after taking the medication. Ms. Ervin recounted a day on which Plaintiff's mother forgot to give him his Adderall, and Plaintiff had "immediate behavioral problems all day," like mood swings, non-attentiveness, frustration, and excitement. Tr. at 79.

A Childhood Disability Evaluation Form was filled out by a non-examining consulting psychologist, Judith A. McGee, Ph.D., on May 27, 2004. Dr. McGee listed Plaintiff's impairments as ADHD and ODD. She opined that Plaintiff's impairment or combination of impairments was severe, but did not meet or medically or functionally equal a deemed-disabling impairment for childhood disabilities listed in the Commissioner's regulations. Using the same six functional domains as Ms. Ervin, Dr.

McGee reported that Plaintiff had no limitation in acquiring and using information and no limitation in caring for himself. She noted that Plaintiff had some limitation, though less than marked, with regard to his health and physical well-being, noting that Plaintiff could not handle frustration appropriately. Tr. at 93-94.

Dr. McGee indicated that Plaintiff had no limitation in acquiring and using information, noting that he had average intelligence, average vocabulary, and that his memory was normal. Plaintiff had marked limitation in attending and completing tasks, as the record indicated that he needed to be continually redirected by his teacher, and needed structure and support for most assignments. Finally, Dr. McGee indicated that Plaintiff had less than marked limitation in interacting and relating with others. As the basis for this conclusion, she cited the references in the record that Plaintiff had a history of fighting with others, played with older children, could be hyper and impulsive, and had a history of being physically and verbally abusive to everyone. In sum, Dr. McGee found only a marked limitation in only one functional domain, attending to and completing tasks. Tr. at 95-97.

In narrative form, Dr. McGee reported that Plaintiff's Adderall prescription had been recently increased to 5 mg. She further stated that Ms. Roustio noted improvements with medication and that Plaintiff could perform more activities since starting the new medication, but that Ms. Roustio believed his medication might need adjustment. Dr. McGee stated, "allegations are credible given hospital medication, teacher and mother's comments." She reiterated that Ms. Roustio had noted improvement with Adderall. Tr.

at 98.

On July 12, 2004, Dr. Baker increased Plaintiff's Adderall to 7.5 mg, noting that Plaintiff improved at day care but that the medication "wore off earlier." Tr. at 122. On July 27, 2004, Lynn Bock, a speech and language pathologist, saw Plaintiff on referral from Dr. Baker, for an evaluation. Ms. Bock diagnosed Plaintiff with articulation disorder. She noted that Plaintiff's Fluharty Preschool Speech and Language Screening Test - 2 indicated that he was in the 2nd percentile in articulation skills, the 58th percentile in receptive language, the 73rd percentile in expressive language, and the 68th percentile in general language. On the Goldman Fristoe 2 - Test of Articulation, Plaintiff was placed in the 3rd percentile. On the Weiss Test of Intelligibility, Ms. Bock noted that Plaintiff's intelligibility of isolated words was 90 percent, his intelligibility of contextual speech was 80 percent, and his total speech intelligibility was 85 percent. She further noted that his voice and fluency were age and gender appropriate. Ms. Bock recommended that Plaintiff receive speech therapy twice weekly to establish intelligible speech, with an expected intelligibility of 100 percent. Tr. at 136-37.

Plaintiff saw Dr. Baker between August 23, 2004, and May 9, 2005, for ADHD, coughing, a loss of appetite (a common side effect of Adderall), and a head injury. On August 27, 2004, Dr. Baker noted that Plaintiff had a speech delay and a loss of appetite and weight. Plaintiff was continued on 7.5 mg of Adderall and Singulair. On December 22, 2004, Dr. Baker indicated that Plaintiff was "doing well" in school, that his "grades improved," and that his appetite was good. Dr. Baker did not note the source of this

information -- presumably, it was Plaintiff's mother.  At that time, Plaintiff was continued on 7.5 mg of Adderall.  Tr. at 146.  On February 10, 2005, Dr. Baker increased Plaintiff's Adderall prescription to 10 mg, noting that his teachers indicated that his prior Adderall prescription was "wearing off earlier."  Tr. at 145.  On March 28, 2005, Dr. Baker refilled Plaintiff's prescription for 10 mg Adderall.  Tr. at 142.

## Evidentiary Hearing of August 16, 2005

Plaintiff and his mother attended the evidentiary hearing, but only Ms. Rustio testified.  She stated that Plaintiff was six years old and would be entering first grade.  He lived with his mother and paternal grandmother in an apartment.  Plaintiff received speech therapy for one hour a day, twice a week, due to his inability to correctly pronounce letters.  Ms. Roustio indicated that she could understand Plaintiff most of the time, but that his grandmother with whom he also lived, and other family members who saw him occasionally, could not understand him most of the time.  Tr. at 16-18.

Ms. Roustio testified that Plaintiff's teachers indicated that he experienced difficulty reading during class and that other students would make fun of him for mispronunciations.  Plaintiff was not in special education for his reading problem because his school only conducted special education testing prior to entry into second grade.  Ms. Rustio believed that Plaintiff was disabled by his ADHD and ODD.  Plaintiff experienced trouble getting along with others and being in large groups of people.  He did not have friends his age and got along better with his older cousin than his younger cousin, whom he picked on.  The record reflects that at this point in the hearing, Plaintiff's attorney

13

asked Plaintiff to be quiet. Tr. at 18-19.

Ms. Rustio testified that Plaintiff received treatment for his ADHD and ODD from Dr. Baker, whom he visited monthly and who prescribed 7.5 mg of Adderall. He had taken Adderall for three years. The visits with Dr. Baker were short in duration, with little counseling. When asked by Plaintiff's attorney whether Plaintiff experienced any physical problems, Ms. Roustio testified that when Plaintiff woke up each morning, his hands would be numb for five to ten minutes. She also testified that Plaintiff had problems writing and could only write his name, but even his name he would write backwards and misspell. Plaintiff did know his ABCs and was capable of counting to 100. Tr. at 19-20.

Plaintiff participated in few social activities, but was in a bowling league the year prior to the hearing. Ms. Roustio stated that she would have to force Plaintiff to sit through the first frame of bowling because he would fight with the other children or throw the ball as hard as he could when he became angered, and threw a fit. Ms. Roustio testified that Plaintiff was capable of bathing, feeding, and dressing himself, but that he would throw a fit when putting on his socks or underwear. Plaintiff only occasionally maintained his personal safety, such as looking both ways before crossing the street. According to Ms. Roustio, this was due to Plaintiff's "zoning out," when he did not pay attention or listen to anything around him. Ms. Roustio indicated that Plaintiff also had impulsive behavior, such as lighting a book of matches indoors, or jumping down a flight of 12 steps rather than walking down them. Plaintiff also required approximately one to

one and one-half hours to calm down before falling asleep.  Once asleep he was a very heavy sleeper.  Tr. at 20-22.

The ALJ then asked Ms. Rustio about Plaintiff's day care history.  Ms. Rustio testified that Plaintiff was kicked out of three different day care centers.  Plaintiff was diagnosed with ADHD when he was at his first day care center in 2001 and was kicked out two days after the diagnosis because the day care could not handle his behavior and feared that he would hurt himself or one of the other children.  Plaintiff attended another day care between March 2004 and September 2004.  Ms. Rustio testified that one of the teachers always commented negatively about Plaintiff's behavior, but that the day care owner told her to ignore the comments as reflective of the teacher's nature.  Tr. at 23.

**ALJ's Decision**

The ALJ initially noted that Ms. Roustio claimed Plaintiff had been disabled since July 1, 2003, but that SSI payments could not be made before March 31, 2004, the date the application for benefits was filed, and that evidence pre-dating this date was "only relevant in historical context."  Tr. at 9.

The ALJ dismissed Plaintiff's claims of ODD and hand numbness because they were not medically determinable impairments, as Plaintiff's initial diagnosis of ODD was later changed to ADHD, and the record did not establish hand numbness as an impairment.  Plaintiff's functional ability was more than minimally limited by his ADHD and an articulation disorder, and so these impairments were severe.  The ALJ determined, however, that these impairments did not meet or medically equal a deemed-disabling

15

impairment listed in the Commissioner's regulations. He stated that this determination was supported "in part" by Dr. McGee's May 27, 2004 assessment. Tr. at 10.

The ALJ then focused on determining whether Plaintiff's impairments functionally equaled a listed impairment. The ALJ noted that under the Commissioner's regulations for childhood disability, functional equivalence is shown by a marked limitation in two, or an extreme limitation in one, of the above-listed six domains: (1) acquiring and using information, (2) attending to and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. The ALJ found that Plaintiff's ability to acquire and use information was not markedly or extremely limited. The ALJ noted that the July 1, 2003 mental status evaluation (by Ms. Miller) indicated that Plaintiff had average intellect and normal memory ability. Furthermore, on December 22, 2004, Ms. Roustio informed Dr. Baker that Plaintiff had been doing well in school and that his grades had improved. The ALJ also found notable Ms. Roustio's testimony at the evidentiary hearing that in first grade Plaintiff would only receive special education for his speech problems. The ALJ discounted Ms. Ervin's report of Plaintiff's problems in this domain, summarily stating that he found the report to be inconsistent with the record. Tr. at 10-11.

The ALJ then found that Plaintiff's ability to attend to and complete tasks was not markedly or extremely limited. The ALJ stated that Ms. Roustio's testimony at the evidentiary hearing that Plaintiff was "off in his own world" was inconsistent with her May 21, 2004 report to the state agency that Plaintiff "pays a lot more attention" and did

not become frustrated when on Adderall. The ALJ noted that the increases to Plaintiff's Adderall dosage resulted from the dosages wearing off earlier in the day, and not from an increase in his symptoms. The ALJ discounted Ms. Ervin's indication in her report that Plaintiff could not follow multi-step instructions, on the ground that this was inconsistent with her indication in the same section of the report that Plaintiff did not have serious problems completing class and homework assignments. He further discounted Ms. Ervin's representation that Plaintiff had a serious problem focusing when spoken to, because Plaintiff "seemed to have no problem" paying attention during play and sports. The ALJ reasoned, "the assumption is that [Plaintiff] has a good ability to attend to matters if they are of interest to him." Tr. at 11.

The ALJ determined that Plaintiff's ability in the domain of interacting and relating with others was also not markedly or extremely limited. He noted Ms. Bock's July 27, 2004 evaluation indicating that Plaintiff was below average in the intelligibility portion of the Fluharty Preschool Speech and Language Screening Test - 2, but relied on Ms. Bock's determination that Plaintiff's speech was 85 percent intelligible overall, with an expected intelligibility of 100 percent, and that Plaintiff only attended speech therapy for two hours each week. The ALJ also found suspect Ms. Roustio's April 19, 2004 Function Report and August 15, 2005 testimony that Plaintiff had difficulty in groups and with children his own age, because of her representation noted in the May 21, 2004 report of contact that, with medication, Plaintiff accepted the presence of others, was less aggressive, and was more thoughtful about his actions when he fought. The ALJ also

noted that Plaintiff's "GAF score of 75" upon discharge from the hospital on July 25, 2003, indicated that Plaintiff's symptoms were "transient and expected reactions to psychosocial stressors." Tr. at 11.

The ALJ stated that there was no evidence indicating a limitation of Plaintiff's ability to move around and manipulate objects, or in the domain of his health and physical well-being. Plaintiff also had no marked or extreme limitation in caring for himself. Though Ms. Roustio testified that Plaintiff did dangerous things like jumping down stairs or lighting matches in his room, Plaintiff could still bathe, dress, and feed himself. Consequently, the ALJ found that Plaintiff was not disabled. Tr. at 11-12.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). "Substantial evidence is that which a 'reasonable mind might accept as adequate to support a conclusion,' whereas substantial evidence on the record as a whole entails 'a more scrutinizing analysis.'" Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). "'The court's review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court "'must also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir.

2001)).  Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'"  Id. (quoting <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995)).  If after reviewing the record, the court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision.  <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004); <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001).

Social security disability benefits are designed for disabled workers, but low-income parents may obtain SSI benefits on behalf of their disabled children as well.  42 U.S.C. § 1382c(a)(3)(C)(I).  In order to be entitled to such benefits, a child under the age of 18 must show that he or she has a medically determinable physical or mental impairment resulting in "marked and severe functional limitations," which can be expected to result in death or which have lasted or can be expected to last for a continuous period of not less than 12 months.  <u>Id.</u>

The Commissioner's regulations set out a three-step sequential evaluation process to determine whether a child's impairment (or combination of impairments) results in marked and severe functional limitations.  The Commissioner begins by deciding whether the child is engaged in substantial gainful activity.  If so, benefits are denied.  If not, at step two, the child's impairment is evaluated to determine whether it is severe.  If the child's impairment is not severe, there is no disability.  If the impairment is severe, at step three the ALJ compares the impairment to the childhood listings in 20 C.F.R., Part 404,

Subpart P, Appendix 1.  If the child's impairment meets, medically equals, or functionally

equals a listed impairment, the child is disabled.  20 C.F.R. § 416.924(d).

A child's impairment is functionally equivalent to a listed impairment if there is an

"extreme" limitation in one of the six functional domains noted above, or a "marked"

limitation in at least two of the domains.  Id. at § 416.926a(b)(1); Hudson ex. rel Jones v.

Barnhart, 345 F.3d 661, 665 (8th Cir. 2003); Garrett ex rel. Moore v. Barnhart, 366 F.3d

643, 647 (8th Cir. 2004); Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 80-85 (2d

Cir. 2003).  A marked limitation is one that "interferes seriously" with the child's ability

to independently initiate, sustain, or complete domain-related activities; an extreme

limitation is one that "interferes very seriously" with these abilities.  Id. at

§ 416.926a(e)(2), (3).[4]

## ALJ's Determination that Plaintiff Did Not Have a Marked Limitation in at Least Two Domains

Plaintiff argues that the ALJ's decision that Plaintiff did not have marked

limitations in acquiring and using information, attending to and completing tasks, and

interacting and relating to others is not supported by the record.  Plaintiff further argues

that the ALJ improperly limited evidence dated before March 31, 2004, when Plaintiff's

application for benefits was filed, using it merely for historical context.  This evidence,

according to Plaintiff, is as relevant as the remainder of Plaintiff's evidence.  Plaintiff

_____

[4]    Alternative measures of functional equivalence, as set out in the regulations, are not
relevant to this case.  See 20 C.F.R. § 416.926a.

also argues that the ALJ improperly discarded Ms. Ervin's firsthand observations of Plaintiff, and failed in his duty to clarify the conflict between Ms. Bock's report and Plaintiff's mother and Ms. Ervin's reports of Plaintiff's speech difficulties, rather than dismissing the latter two as inconsistent with the record. Plaintiff contends that the ALJ further erred by assuming that Plaintiff's Adderall dosage increases were not caused by Plaintiff's increasing symptoms, but by the dosages wearing off too early in the day.

The Commissioner argues that the ALJ's determination that Plaintiff's limitations were not markedly or extremely limited in any domain, is supported by substantial evidence. The Commissioner notes that the ALJ appropriately determined that Plaintiff's evidence of disability prior to the date of filing for disability benefits was relevant only to provide historical context for evidence of Plaintiff's condition during the pendency of his claim. The Commissioner also argues that Ms. Ervin's assessment of Plaintiff's functioning was appropriately discredited because it was inconsistent with the record as a whole, especially the portion of the record within the relevant time period. In support, the Commissioner cites Plaintiff's GAF of 75 upon discharge from the hospital on July 25, 2003, the May 21, 2004 report of contact, and Ms. Bock's July 27, 2004 finding that Plaintiff's speech was 85 percent intelligible. The Commissioner argues that the reports from Dr. Baker and Ms. Roustio that Plaintiff's medication was wearing off earlier support the ALJ's finding on this point.

Under the Commissioner's regulations, the domain of attending to and completing

tasks considers how well a child is able to focus and maintain attention; and begin, carry through, and finish activities, including pace of performance and ease of changing activities. 20 C.F.R. § 416.926a(h). This regulation explains that preschool age children (ages three to six) should be able to pay attention when spoken to directly, sustain attention to play and learning activities, and concentrate on activities like putting puzzles together or completing art projects; focus long enough to do many more things by himself, such as getting clothing together and dressing themself, feeding himself, or putting away his toys; wait his turn; and change activities when a caregiver or teacher says it is time to do something else. Id. at § 416.926a(h)(2)(iii).

The domain of interacting and relating with others considers how well a child initiates and sustains emotional connections with others, develops and uses the language of his or her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. Id. at § 416.926a(i). Preschool age children are dependent on caregivers, but should begin separating from them; be able to express emotions and respond to the feelings of others; begin initiating and maintaining interactions with adults, but also show interest in, then play alongside, and eventually interact with other children the same age; be able to spontaneously communicate wishes or needs, first by using gestures, and eventually by speaking words clearly enough that people who know the child can understand what the child is saying most of the time. Id. at § 416.929a(i)(2)(iii).

Here, the Court finds the ALJ's decision lacking in several significant ways. First, the ALJ appears to rely heavily upon Plaintiff's GAF when he was discharged from the hospital on July 25, 2003, which the ALJ read as 75. As noted above, the Court finds that the record entry pertaining to this GAF score is illegible. After reviewing the record, the Court finds it at least questionable that Plaintiff would experience such a dramatic improvement to a GAF of 75 from a year-high GAF of 35, noted on July 2, 2003. A GAF score of 75 is inconsistent with the later reports of Plaintiff's behavior, including the medical records from February 6, 2004, and Ms. Roustio's Function Report of April 19, 2004 (approximately one year later), indicating that Plaintiff would often fight with other children, often became violent, and would try to hurt her if he became angry at her. It is also inconsistent with Ms. Ervin's report on May 25, 2004, describing Plaintiff's numerous problems at school. The ALJ relied on his belief that Plaintiff had a GAF of 75 to find that Plaintiff's condition was "transient." But if anything, a GAF score of 75 on this record would be the anomalous event. There is no other support in the record for a finding that Plaintiff's severe difficulties were "transient."

The ALJ also relied on the fact that Plaintiff, upon entering first grade, would only receive special education for speech problems. Plaintiff's mother testified, however, that Plaintiff was not in special education for his reading problem because the school only conducted special education testing prior to entry into second grade, and there is no evidence to the contrary in the record.

In addition, the ALJ did not explain sufficiently why he found Ms. Ervin's report inconsistent, either internally or with the record as a whole. The Commissioner's regulations state that non-medical sources, such as parents and teachers, provide relevant information of the effects of a child's impairment on his activities and how he functions on a day-to-day basis. 20 C.F.R. 416.924a(a)(2). See also Richardson v. Massanari, 2001 WL 34152093, at *10 (N.D. Iowa Sept. 27, 2001) (explaining that observations and opinions of a child's teachers are particularly relevant at the "functional equivalent" step). Ms. Ervin's report demonstrates that Plaintiff was markedly limited in at least two relevant domains. She indicated obvious, serious, or very serious problems in relating with other children, with descriptions of violent behavior toward others, a very serious problem expressing anger appropriately, and an obvious problem playing cooperatively with other children. Her report consistently indicated that Plaintiff had problems in class or at play, most of which were serious or obvious, and she explained the need to structure and support Plaintiff's learning experience lest his assignments remain incomplete. That Ms. Ervin may have reported greater difficulties in carrying out multi-step instructions and in paying attention when spoken to directly, than in completing class or homework assignments and in paying attention when playing sports, does not indicate internal inconsistencies.

Nor is Ms. Ervin's report inconsistent with the record as a whole. This report is consistent with Ms. Roustio's Function Report of April 19, 2004, and with Ms. Roustio's

testimony at the August 16, 2005 hearing one year later.  The Court does not believe that Ms. Ervin's report is inconsistent with the May 21, 2004 report of phone contact with Ms. Roustio, which indicated that Plaintiff had improved in some areas.  Viewed in the context of the remainder of the record, the Court believes that a fair reading of the report of contact shows that Plaintiff had improved with Adderall, but not that his problems were transient or necessarily no longer disabling.  Dr. Baker's notes from July 12 and December 22, 2004, memorializing reports of limited improvement, are consistent with this reading.

Dr. McGee's May 27, 2004 review of the record led her to conclude that Plaintiff had marked limitations attending to and completing tasks.  The ALJ did not mention this conclusion in his decision.  Although Dr. McGee indicated that Plaintiff had less than marked limitations interacting and relating with others, this conclusion seems to be inconsistent with the factors Dr. McGee listed in support thereof: a history of fighting with others, playing with older children, acting hyper and impulsive, and a history of physical and verbal abuse to everyone.  And Dr. McGee's opinion that Plaintiff had no limitation in acquiring and using information appears to be inconsistent with the record as a whole.

The ALJ did not note any inconsistency between Ms. Bock's July 27, 2004 assessment that Plaintiff was 85 percent intelligible, and Ms. Roustio's April 19, 2004 Function Report and Ms. Ervin's May 25, 2004 report.  Ms. Ervin indicated that very

little of Plaintiff's speech could be understood, whether the topic of conversation was known or unknown, and upon repetition, only one-half to two-thirds of Plaintiff's speech could be understood. Ms. Roustio indicated in the Function Report that Plaintiff could only be understood some of the time when speaking to those unfamiliar with him, and that people like Plaintiff's grandmother, who lived with Plaintiff, had trouble understanding him. Nor did the ALJ resolve the apparent inconsistency between Ms. Bock's test result placing Plaintiff in the 2nd percentile for articulation and her conclusion that Plaintiff was 85 percent intelligible. As such, the Court agrees with Plaintiff that the case should be remanded to the ALJ to develop the record and resolve these potential inconsistencies. The Eighth Circuit dealt with a similar situation in Wilcutts v. Apfel, 143 F.3d 1134 (8th Cir. 1998). In that case, there were inconsistencies in the record with regard to the claimant's literacy, and the Court remanded the case for further development of the record to determine his literacy. Wilcutts, 143 F.3d at 1137.

In sum, the Court does not believe that the ALJ's decision that Plaintiff did not have a marked impairment in attending to and completing tasks, and in interacting and relating to others, is supported by substantial evidence in the record for at least a 12-month period beginning on March 31, 2004, the protective filing date of the application for benefits. There is some evidence that Plaintiff's impairments improved once he was put on Adderall, namely, the May 2004 report of contact with Plaintiff's mother, and Dr. Baker's notes from July 12 and December 22, 2004. Upon review of the record as a

whole, the Court does not believe that this is sufficient evidence to support a finding that Plaintiff was no longer disabled at some time prior to March 31, 2005.  Cf. Puckett ex rel Cunningham v. Apfel, No. C98-2113, at *5-6 (N. D. Iowa Dec. 9, 1999) (finding that denial of childhood benefits was supported by substantial evidence where improvement of child's hyperactivity with medication was documented by a therapist's report and a questionnaire filled out by his special education teacher noting specific acceptable behavior in several areas); Campbell ex re. Campbell v. Chater, 923 F. Supp. 1184, 1197 (E.D. Mo. 1996) (same).

## CONCLUSION

The Court believes the decision of the Commissioner must be reversed, and the case remanded to the Commissioner for further consideration and development of the record to determine whether Plaintiff met the severity and durational requirements for entitlement to disability benefits.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and that the case is **REMANDED** to the Commissioner for further consideration and development of the record.

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of September, 2007.